[No. 3131.]

PLEASANT ROBINSON *v.* THE STATE.

1. MURDER—MALICE—EVIDENCE.—As tending to show a motive for the defendant to kill the deceased it was proper to admit in evidence an affidavit charging the defendant with an offense, made by the deceased a short time before her death, and upon which a prosecution was pending at the time of that event.

2. SAME.—It was error to permit a witness to state what the deceased told her about a third party beating her nearly to death, such evidence being hearsay, and no part of the *res gestæ*, and in no way connected with or bearing upon the issue of the defendant's guilt. It did not appear that what the deceased said was in explanation of her then sickness and was a part of the *res gestæ* of it.

3. SAME—NEW TRIAL—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for murder in the first degree; wherefore a new trial should have been awarded.

APPEAL from the District Court of Falls. Tried below before the Hon. B. W. Rimes.

The conviction in this case was for murder in the first degree, perpetrated upon one Jane Washington, in Falls county, Texas, on the second day of November, 1883. A life term in the penitentiary was the punishment awarded. The defendant and the deceased were both negro women.

Winnie Payne testified, for the State, in substance, that, at the time of the death of Jane Washington, on Friday, November 2, 1883, the defendant and her daughter, Nancy Glass, and Dave Warren lived together in a house on Mr. Battle's place, in sight of and in hearing distance of the house on the same place occupied by Henry and Jane Washington. The defendant and her idiotic daughter, Nancy Glass, went to Henry Washington's to wash on the fatal Friday. Before the witness got her dinner, the defendant returned and asked if witness was a good hand to keep secrets. Witness replied that she could keep secrets if they were not bad ones. Defendant replied: "You are not the woman I am looking for." Witness said to her: "You have told me secrets, and I have kept them." She replied: "Yes, you have, and I think you are a good woman. Well, don't you think that devil (meaning Henry Washington, witness's brother) hit

that woman over the head last night and liked to have killed her?" Witness then said: "O, Lord! did Henry do that? I am going right down to see him about it." Defendant then said: "Don't go; I was not telling you the truth: I don't know why I told you that lie." Defendant then went back toward Henry's, carrying a bundle of clothes with her.

Some time later George Ann O'Neal and Nancy Glass came to witness's house and said that Jane Washington was burned up. Witness immediately started to the house and *en route* met the defendant, who asked what witness had been told. The defendant caught witness and told her not to go to Henry's, that she would injure herself, as she was then far advanced in pregnancy. The witness, on reaching the house, found no one but Henry Washington at first, but soon discovered the deceased lying in the fire. She called to Henry to pull his wife out of the fire, but he did not do it then. Jim Freeman being called, ran into the house, and he and Henry pulled Jane out. She was dead.

During an acquaintance of fifteen or twenty years, the witness had never known the deceased to have fits. She had not, however, lived near the witness for some time until the year previous to her death. The deceased and the defendant lived in constant trouble about Henry Washington. Witness had a conversation with the defendant on the day before Jane's death. She said that Jane had filed a complaint against her at Marlin, and that they (deceased and defendant) would never meet at a trial. Witness looked hard at defendant when the remark was made, and defendant said: "You think that I am going to hit that woman, but I am not. I am going to lay in my bed and pray to God to kill her." In this same conversation defendant said that deceased had gone to Marlin and slandered her, and that if she could kerosene the deceased and burn her up without destroying Mr. Battle's house, she would do so.

Cross-examined, the witness stated that she had never observed any undue intimacy between Henry and the defendant, and had seen no conduct of theirs to justify Jane's jealously. Henry worked land on Mr. Battle's place, and the defendant and her children were in Henry's employ. He could not have worked that land without their help. Witness's pregnancy was the reason the defendant assigned for not wishing witness to go to Henry's house at the time of Jane's death. Witness described the fire place in which the death occurred as large, and stated that she smelled nothing like kerosene.

George Ann O'Neal was the next witness for the State. She testified that she had known deceased as a healthy, robust woman for a long time, and had never known her subject to fits. The witness was near the house at the time deceased was burned to death. About one o'clock witness heard the defendant calling her and Buck Payne. She went to Henry Washington's house, where she saw the deceased lying dead in the fire, her clothes smoking. The defendant, Henry Washington, Nancy Glass and Dan Warren were at the house. Witness left shortly, and returned in about an hour, when she found that the body had been dragged from the fire. She met Winnie Payne when she left the first time. Winnie, being told what had happened, went to Henry Washington's house. Witness had heard the defendant and the deceased quarrel about Henry Washington. The deceased was a very jealous woman. Witness had never heard the defendant utter threats against the deceased.

Cross-examined, the witness stated that while going to the house on the first occasion mentioned (on being called), she met the defendant in the lane near the house. Defendant was then very much excited. The deceased frequently accused the defendant of improper intimacy with Henry, which the defendant invariably denied. Defendant and deceased were both women of fifty or sixty years of age. Witness heard that during the August preceding her death, the deceased fell in a faint on the road from church. She never heard of her falling on any other occasion. Jane was dead when witness first reached the house. Defendant was very much excited, and said in reply to questions: "That woman is in the fire. I did not know it until Henry opened the door and told me." The chimney was on the north side of the house. The smoke from the chimney drifted southwards. The defendant that day washed on the north side of the chimney.

The substance of the testimony of G. B. Robbins, one of the jury of inquest, was that from impressions in the ashes the body of the deceased must have lain in the fire, head first, face downwards, with her limbs extending toward the opposite door. A pot and oven stood in the right hand space of the fire place. The nose, lips and skin on the face were burned off. None of the burns extended to the hollow, but reached to the waist. A wound an inch long was discovered on the top of the head of the deceased. Some blood from the ear had evidently trickled over the cheek. The wound on the head had been dressed with

a rag, saturated, evidently, in sugar and turpentine. Witness saw no other wounds, smelled no kerosene, and, though he examined closely, discovered no evidence of oil about the body or the house. Nothing with which a wound could have been inflicted was found in the house save a shovel, and that had neither blood nor hair on it. The burns were sufficient in themselves to produce death.

C. A. Pruitt, a member of the coroner's jury, testified as did the last witness, except that, though not certain, he thought he detected the odor of kerosene on a small fragment of cloth which he took from under the body. He found no indications of oil about the body or premises.

Doctor Price testified, in substance, that he exhumed the body and made a *post mortem* examination of the skull, in the presence of the jury of inquest. The scalp was burned from the forehead, and there was a small laceration through the scalp on top of the head. The effect of fire and sun heat is doubtless the same, both capable of producing heatstroke. Heatstroke is most frequently very sudden, causing instantaneous loss of motion and self-control, and in cases where the patient recovers at all, the recovery is complete within a few hours. Unconsciousness and even death very frequently ensue as an instantaneous result of heatstroke, and diseases of this and like character, which result in sudden death, such as catalepsy, epilepsy, aneurism of either heart or brain, asphyxia, etc., are not usually preceded by premonitory symptoms. The witness discovered no evidence of a blow on the skull. Epilepsy, catalepsy and aneurism of the brain are generally discoverable from a *post mortem* examination of the brain. Witness did not examine deceased's brain.

Hall Taylor, another member of the coroner's jury, testified, in addition to what was stated by the previous witnesses who were members of that jury, that he positively smelled coal oil on the rag smelled by Pruitt, and that he saw a small grease spot on the floor that smelled like coal oil. He saw a four-inch wound on the head, into which he inserted his finger and found the skull broken. Lewis Maxwell, another member of the coroner's jury, testified to the same effect.

Tilda Washington, wife of Henry Washington's brother Sank, testified, in substance, that on the night before Jane's death, she, Jane, came to witness's house, near by, and asked her to bind up a small gash in her head, which she said had been inflicted by Henry. Witness bound it up next day with a rag, sugar and

turpentine. Witness saw the wound on the head after death. It was the same wound she had bandaged. She at no time regarded this wound serious; it was nothing more than a small gash. She was at Henry's house and saw the body after death. She smelled no coal oil, and saw no evidence of coal oil about the body or house. Defendant and Jane appeared perfectly friendly on Thursday evening before the death of the latter.

Fred. Berry testified that he had heard the deceased and defendant more than once quarrel about Henry Washington, and in one quarrel heard defendant threaten to kill deceased.

Kiah Washington, Henry's brother, testified for the State, in substance, that he was at and in the house, examined the body, and both saw and smelled coal oil on the body after death. When he remarked, after examining the body: "The Lord Jesus Christ! This woman is murdered; and furthermore, she is kerosened," Henry Washington put his hand in his pocket and said: "Shut up; I don't want such talk around here." Witness was not on good terms with his brother Henry. Neither Sank nor Sandy Washington were at Henry's house while witness was there. Some time prior to Jane's death, defendant told witness that Jane had gone to Marlin and abused her, and that she would kill Jane in less than three months.

The substance of the testimony of Peter Crutchfield, for the State, was that he passed Henry Washington's house between one and two o'clock on November 2, 1883, and saw defendant and her daughter washing some fifteen or twenty steps from the house. The house was closed. Considerable smoke was floating out of the chimney, and the witness smelled a strange odor, like rags and meat burning.

The material part of the testimony of Dick Payne, a witness for the State, was, in effect, that he occupied a portion of the house occupied by defendant. He knew that the defendant and Henry Washington were very intimate. Henry paid her attentions usually paid to a wife. Witness had never seen Henry and defendant in bed together, but had often gone to bed leaving them in defendant's room together. The defendant and deceased were constantly quarreling about Henry. Witness had heard the defendant threaten to kill the deceased. On one occasion, in May, 1883, defendant, with a hatchet and blanket, went to George Ann O'Neal's house looking for Jane. On her return she said that she wished God would provide her a dark night, that she might put on a black dress and have her aim. Witness

had never told this until now. Henry's attention to defendant was rather constant. Henry and the defendant had a quarrel on the day of Jane's death. Defendant came out of her house with a knife, about breakfast time, cursing Henry. She said she would do murder that day—would kill from the largest to the least.

Jesse Blocker testified, for the State, that some time before Jane's death he saw defendant standing in the road with a club in her hand, daring Jane to breathe. He remembered the occasion when Freeman brought the deceased to his house, suffering from a fit into which she had fallen on her way home from church.

Tony Grant testified, in substance, that he was at Henry Washington's house on the day that Jane was burned, and before that event took place. Jane and the defendant were in the house quarreling. He then went to Henry Washington, who was with Dave Warren in the field.

Hannah Blocker testified, in substance, that the deceased was brought to her house one day in August by Jim Freeman, having fallen in the road on her way from church. Deceased told the witness that Henry Washington had beat her nearly to death.

The complaint against the defendant made by Jane Washington, referred to in the head notes and opinion, was next introduced in evidence by the State.

The justice of the peace who presided at the inquest testified, for the defense, that he failed to detect by any means the presence of kerosene about the body or premises. The jury was divided as to whether a certain rag smelled like it had been saturated with kerosene.

Alex. Washington testified, for the defense, that he went to Henry's house with the State's witness Kiah Washington. Kiah did not go into the house at all. He merely opened the door, looked in and said: "Lord have mercy! This woman has been murdered; and, more, she has been kerosened." Jane's body was then covered with a sheet.

Davis Warren testified, for the defense, that Henry Washington visited defendant very often, but he knew of no love affair between them. Defendant and Henry had a quarrel early on the morning that deceased was burned. Witness went to the field with Henry on that morning. In about an hour's time Henry left the field, going toward his house. He was gone

about one hour. Haywood Douglass came into the field during Henry's absence. Henry, on his return, asked Haywood to pick cotton. In a short time Henry went across the field, he said, to get a melon. Haywood left on Henry's return. After a short time Henry and witness went to weigh cotton. Henry emptied his cotton and told witness to go and see what was the matter about the house. Witness went, found the door locked, returned and informed Henry. Henry replied: "Oh yes. I have the key." The witness and Henry went to the house together; Henry unlocked the door, and, speaking to the defendant, who was near, said: "Sister Pleasant, here is this woman in here burning up." Defendant replied: "O! O! O! You are the very man that killed her." Harry said: "You hold your peace," and pushed the defendant back as she started in the house.

The witness did not know how far across the field Henry went when he went after the melon. The cotton was too tall for him to see. He did not know what Haywood came to the field for. Tony Grant came to the field after Haywood left. When the witness first went to the door of the house, the defendant was coming in the gate, with a bundle of clothes, from the direction of Winnie Payne's. She went to the wash place in the rear, and was returning toward the door when Henry unlocked it. This was but a short time after Tony Grant came to and left the field.

James Freeman testified that, about four o'clock on a warm evening in August, the deceased fell in the road on her way home from church, the witness supposed from heat. She became perfectly helpless, but retained consciousness. Witness and Dick Payne took her to Jesse Blocker's in their arms. Witness had never known of her having another attack of the kind. Witness assisted to take the deceased out of the fire. He neither saw nor smelled coal oil. This witness corroborated Alex. Washington respecting Kiah Washington's actions and statements at the house.

Sanford Washington testified that he talked to the defendant on the night after Jane's death. The defendant protested that she was perfectly ignorant of how the burning happened.

The motion for new trial raised the questions discussed in the opinion.

*Oltorf & Holland,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.    1.   For the purpose of showing a motive on the part of the defendant to kill the deceased, it was not error to admit in evidence the affidavit made by deceased a short time before her death, charging the defendant with a violation of law, which affidavit was made for the purpose of having said defendant arrested and tried for said violation, and was pending at the time of deceased's death.   (*Taylor* v. *The State,* 14 Texas Ct. App., 340; *Rucker* v. *The State,* 7 Texas Ct. App., 549.)

2.   It was error to permit the witness Hannah Blocker to state what the deceased told her concerning Henry Washington's beating her nearly to death.   This was hearsay, and was no part of the *res gestœ,* and in no way connected with or bearing upon the issue of defendant's guilt.   It does not appear that what deceased said was in explanation of her then sickness, and was a part of the *res gestœ* of such sickness.   (*Hammel* v. *The State,* 14 Texas Ct. App., 326.)

3.   It is not claimed by appellant's counsel that the court erred in its charge to the jury, or in refusing special instructions requested by the defendant.   We have, however, examined the charge of the court and the special instructions which were refused, and we are unable to see that any error has been committed in giving to the jury the law of the case.   We think the charge given was correct, and contained all the law applicable to the evidence, and this seems to be conceded by appellant's counsel, as they have not directed the attention of this court to any supposed defect in the same.

4.   Appellant's counsel rely for a reversal of the judgment mainly upon the ground that the verdict of the jury is not supported by the evidence.   We have given to the statement of facts a most careful consideration, and we are clearly of the opinion that the evidence is insufficient to support the conviction.   We will not recite the evidence, as the Reporter will collate and publish the same in connection with this opinion.   It is not shown by the evidence certainly, and beyond a reasonable doubt, that deceased came to her death by the criminal act or agency of any one.   There were no marks of violence upon her person, except those produced by the fire, and an old wound on the top of the head, which was shown to have been made some time prior to her death.   There were no indications in the house of a struggle having taken place — in fact, no signs or evidences whatever that violence had been used upon the deceased.   Deceased made no outcry that was heard, and no un-

usual noise was heard at or about the house at the time of her death; and yet there were several persons within hearing of the place of her death at the time. She was a woman who weighed one hundred and thirty or one hundred and forty pounds, and was apparently in good health. It is not reasonable to conclude that she could have been murdered without a struggle or an outcry on her part, and without the least evidence of violence being left upon her person.

It was the theory of the prosecution that kerosene oil was thrown upon her, and that she was then thrown into the fire and burned to death. While it is possible that this theory is correct, it is not established by the evidence, but, on the contrary, to our minds the evidence renders it improbable that her death was thus produced. There was but little fire in the fire place, but one chunk of fire, as some of the witnesses testify; there were no indications in or about the fire place of a struggle; a pot and a skillet, containing food which was being cooked, were in the fire place, and were undisturbed. No kerosene oil was found about the house, though some of the witnesses testified that they smelled it, and one witness said he saw some on the floor. Other witnesses, however, testified that they examined closely and saw no oil upon the floor, and could smell none about the body. But, it is said, perhaps she was killed, or nearly killed, and then saturated with oil and placed in the fire. If such had been the case, it is reasonable to suppose that if external violence sufficient to kill or render her helpless had been used, some evidence of such violence would have been found upon her dead body, and the testimony is conclusive that no such evidences were found then, nor subsequently, when the dead body was exhumed and particularly examined by an expert for the purpose of discovering indications of violence.

On the other hand, it appears from the evidence of a physician who testified in the case, that there are various diseases, and some of which are not infrequent, that produce death or unconsciousness suddenly, without any premonition. Among these he mentions heatstroke, catalepsy, epilepsy, hemiplegia, asphyxia, aneurism of the heart or brain. Would it not be as reasonable to suppose that the deceased was suddenly stricken down by some one of these diseases, and fell upon the fire, as to conclude from the evidence that she was murdered by the defendant or any other person? Would not this supposition, that her death was thus naturally produced, account for the absence

of all external evidences of violence inflicted upon her? And is not this theory perfectly consistent with the innocence of the defendant? Is there anything unreasonable in such a theory? In connection with this hypothesis, it is worthy of notice and consideration that, in August previous to the death of deceased in November, while she was returning home from church, she suddenly fell in the road, helpless and unconscious, and in this condition was conveyed to a house near by, where she was attended to, and in a little while restored to health. This sudden attack was at the time supposed by those who witnessed it to be heatstroke, the weather at that time being very warm. Might she not on the occasion of her death have been again heatstricken? Her death occurred near midday, and while she was apparently engaged in cooking over the fire, and the physician who testified in the case informs us that fire, as well as the heat of the sun, may produce heatstroke.

Giving to the evidence before us full credit and weight, admitting as true every portion of the State's evidence, we think it falls far short of establishing with that degree of certainty which the law demands that the deceased came to her death by violence inflicted upon her by another. And it further falls far short of proving that if such violence was inflicted it was inflicted by the act or agency of the defendant. In short, we are of the opinion that the evidence, instead of clearly and satisfactorily establishing the *corpus delicti*, leaves it in great doubt and uncertainty, and is altogether too uncertain and inconclusive to warrant this conviction. (*Lovelady* v. *The State*, 14 Texas Ct. App., 545; *Walker* v. *The State,* Id., 609.)

We think the court erred in refusing to grant the defendant's motion for a new trial, and because of such error the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered May 28, 1884.